No. 1:16-cv-6054-JGK

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE SABINE OIL & GAS CORPORATION, *et al.*,

*Reorganized Debtors.*

OFFICIAL COMMITTEE OF
UNSECURED CREDITORS, *et al.*,

*Appellants*,

*v.*

SABINE OIL & GAS CORPORATION, *et al.*,

*Appellees.*

On Appeal from the United States Bankruptcy Court
for the Southern District of New York
Chapter 11 Case No. 15-11835 (Chapman, J.)

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

James H.M. Sprayregen, P.C.
Paul M. Basta, P.C.
Jonathan S. Henes, P.C.
Christopher J. Marcus, P.C.
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY   10022
Telephone: (212) 446-4800

Gabor Balassa, P.C. (admitted *pro hac vice*)
Ryan Blaine Bennett (*pro hac vice* forthcoming)
A. Katrine Jakola (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle Street
Chicago, IL   60654
Telephone: (312) 862-2000

Christopher Landau, P.C.
Jennifer M. Bandy
**KIRKLAND & ELLIS LLP**
655 Fifteenth Street, N.W.
Washington, DC   20005
Telephone: (202) 879-5000

*Counsel for Reorganized Debtors-Appellees*

*Additional Counsel on Signature Block*

September 9, 2016

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Bankruptcy Procedure 8012, the undersigned counsel certifies that the only company that directly or indirectly owns 10% or more of any class of the Reorganized Debtors' equity interests is Sabine Oil & Gas Holdings, Inc. Sabine Oil & Gas Holdings, Inc. holds 100% of Reorganized Debtor Sabine Oil & Gas Corporation's common stock. Wells Fargo Bank, N.A. and Barclays Bank PLC are the only entities that own more than 10% of any class of Sabine Oil & Gas Holdings, Inc.'s equity interests.

Pursuant to Federal Rule of Bankruptcy Procedure 8012, Appellee Wells Fargo Bank, National Association states as follows: Appellee Wells Fargo Bank, National Association (a private non-governmental party) is a wholly owned subsidiary of Wells Fargo & Company, a financial holding company and a bank holding company under the Bank Holding Company Act with shares that are publicly traded on the New York Stock Exchange.

Pursuant to Federal Rule of Bankruptcy Procedure 8012, Appellees Barclays Bank PLC and Barclays Capital Inc., by and through their undersigned counsel, certify as follows:  Barclays Bank PLC is a wholly owned subsidiary of Barclays PLC, which is a publicly held corporation, and no other publicly traded company owns 10% or more of Barclays Bank PLC's stock. Barclays Capital Inc. identifies the following as parent corporations or publicly held corporations that own 10% or more of any class of its equity interests:  Barclays PLC, Barclays Bank PLC, and Barclays Group US Inc.

Pursuant to Federal Rule of Bankruptcy Procedure 8012, the undersigned counsel certifies that Wilmington Trust, N.A. is a wholly-owned subsidiary of Wilmington Trust Corporation, which is a wholly owned subsidiary of M&T Bank Corporation.  No corporation owns 10% or more of the stock of M&T Bank Corporation.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 1

      A.     Case Background And Plan Confirmation ............................................ 1

      B.     Substantial Consummation Of The Plan .............................................. 5

ARGUMENT .................................................................................................... 6

I.      The Plan Has Been Substantially Consummated ................................... 7

II.     The Committee Cannot Overcome The Presumption Of Equitable Mootness ................... 8

      A.     The Settlement Was Integral To The Plan ........................................... 8

      B.     Unraveling The Settlement Would Be Inequitable .............................. 11

CONCLUSION .................................................................................................. 14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahuja v. Lightsquared Inc.*,
    644 F. App'x 24 (2d Cir. Mar. 22, 2016)........................................................ 13

*In re Charter Commc'ns, Inc.*,
    691 F.3d 476 (2d Cir. 2012)........................................ 6, 7, 8, 11, 12, 13

*In re Chateaugay Corp.*,
    10 F.3d 944 (2d Cir. 1993)............................................ 6, 7, 12, 14

*In re Chateaugay Corp.*,
    988 F.2d 322 (2d Cir. 1993)................................................................ 6, 12

*In re Crystal Oil*,
    854 F.2d 79 (5th Cir. 1999) ................................................................ 12

*In re Delta Air Lines, Inc.*,
    374 B.R. 516 (S.D.N.Y. 2007)............................................................ 11

*In re Metromedia Fiber Network, Inc.*,
    416 F.3d 136 (2d Cir. 2005)........................................................ 8, 12, 13

*In re Specialty Equip. Cos.*,
    3 F.3d 1043 (7th Cir. 1993) ................................................................ 11

*In re STN Enters.*,
    779 F.2d 901 (2d Cir. 1985).................................................................... 2

*In re U.S. Airways Grp., Inc.*,
    369 F.3d 806 (4th Cir. 2004) ................................................................ 6

*In re U.S. Brass Corp.*,
    169 F.3d 957 (5th Cir. 1999) ................................................................ 12

*In re UNR Indus., Inc.*,
    20 F.3d 766 (7th Cir. 1994) ................................................................ 6

*Mac Panel Co. v. Virginia Panel Co.*,
    283 F.3d 622 (4th Cir. 2002) ................................................................ 11

**Rules and Statutes**

11 U.S.C. § 1101(2) ................................................................................ 7, 8

11 U.S.C.§ 1101(2)(A)............................................................................ 7

11 U.S.C.§ 1101(2)(C) ................................................................................................ 7

## INTRODUCTION

This appeal is equitably moot because the plan of reorganization it challenges has now been substantially consummated, and there is no fair or realistic way to "unwind" this complex integrated transaction.  This Court should therefore dismiss the appeal.

## BACKGROUND

### A.    Case Background And Plan Confirmation

The former Debtors, Sabine Oil & Gas Corp. and certain affiliated companies (collectively "SOGC"), are engaged in the acquisition, production, exploration, and development of onshore oil and natural gas properties in the United States.  SOGC is the product of the December 2014 merger of Sabine Oil & Gas, LLC ("Legacy Sabine") into Forest Oil Corporation ("Legacy Forest").  Order [Dkt. 923] at 1-2.  Although the merger was expected to result in substantial performance synergies, a sharp slump in energy prices dashed that expectation.  In May 2015, SOGC's Board established a special Independent Committee to investigate potential claims arising out of the merger.  *Id.* at 27.

Before that Independent Committee could finish its investigation, however, SOGC filed for Chapter 11 bankruptcy protection in July 2015.  *Id.* at 29.  The Independent Committee thereafter continued to investigate potential claims on behalf of the bankruptcy estate.  *Id.* at 27.  The Independent Committee's investigation was extensive, spanning more than eight months and involving the analysis of more than 100,000 documents and multiple witness interviews.  The Independent Committee identified only one constructive fraudulent conveyance claim that was both colorable and in the Debtors' best interests to pursue, and the Debtors accordingly pursued that claim.  *Id.* at 28–29, 51.

The Independent Committee was not alone in looking into potential claims.  Once SOGC filed for bankruptcy, the Official Committee of Unsecured Creditors was formed and undertook

its own investigation into potential claims. *Id.* at 29. The Official Committee, however, adopted a "kitchen sink" approach to the matter. At the end of its investigation, the Official Committee filed motions seeking standing under the Second Circuit's decision in *In re STN Enters.*, 779 F.2d 901 (2d Cir. 1985), to pursue an array of *29* derivative claims against *45* putative defendants. *See* Official Committee's First *STN* Standing Motion [Dkt. 518], Ex. A at 1, 40-51; Official Committee's Second *STN* Standing Motion [Dkt. 609] Ex. A at 1, 73–81. These claims included two constructive fraudulent conveyance claims (in addition to the one that the Debtors themselves had decided to pursue), and a variety of "bad acts" claims. Order [Dkt. 924] at 1-2. After full briefing and a 15-day hearing, the bankruptcy court (Chapman, J.) issued a 108-page decision denying the Committee's *STN* standing motions in their entirety. *Id.* at 30, 108. This Court affirmed the bankruptcy court on all scores. *See* Op. & Order [Dkt. 39] at 46. Appeals from that decision are now pending in the Second Circuit. *See* CA2 Dkt. Nos. 16-2187, 16-2318, 16-2319.

Meanwhile, on July 27, 2016, after a 14-day confirmation hearing, the bankruptcy court confirmed SOGC's proposed plan of reorganization. *See* Confirmation Order [Dkt. 1359]. The centerpiece of that plan, which was the product of extensive arm's-length negotiations, is a settlement between the Debtors, the First Lien Lenders that had provided the Debtors with reserve-based loans ("RBL Lenders") and would have been entitled to the Debtors' entire value as going concerns; and certain Second Lien Lenders. *See id.* ¶ 56. Under the settlement, the RBL Lenders: (1) settled their massive adequate protection claims; (2) settled certain lien-related disputes; (3) accepted equity in satisfaction of their adequate protection and secured claims totaling over $1 billion, despite being entitled to payment in cash on their adequate protection claims; (4) waived their substantial unsecured deficiency claims; (5) provided commitments for

2

up to $200 million of exit financing; (6) ceded more than $70 million in stock and warrants to the Second Lien Lenders; and (7) ceded more than $28 million in stock and warrants to unsecured and undersecured creditors.  *Id.* ¶ 50.  In exchange, the RBL Lenders required releases of estate claims, including the claims at issue in the *STN* standing appeal, along with mandatory releases of certain third-party claims against the RBL Lenders.  Mem. Decision [Dkt. 1393] at 72.  The plan also released other putative defendants, including the Legacy Forest officers and directors from estate claims, including claims that the Independent Committee, the bankruptcy court, and this Court each found to be not colorable.  Confirmation Order [Dkt. 1359] ¶ 52.  The Debtors concluded that these releases were reasonable in light of the Independent Committee's extensive investigation and conclusions that the claims were not colorable or in the best interests of the estates to pursue.  Mem. Decision [Dkt. 1393] at 72-73.

In confirming the plan, the bankruptcy court rejected the Official Committee's objections, which included objections to the settlement and to the debtor and third-party releases in the plan.  *See* Objections [Dkt. 1168] ¶¶ 2, 9, 34, 39, 71.  In its 66-page order, the bankruptcy court, among other things, approved the releases and found the settlement "fair, equitable, and well above the lowest point in the range of reasonableness."  *See* Confirmation Order [Dkt. 1359] ¶¶ 49-52, 56-59.  The court further found that the settlement was "an integral element of the transactions incorporated into the Plan," *id.* ¶ 59, and that the RBL releases were "an inextricable and critical component of the Plan," without which the RBL Lenders would not have made substantial contributions necessary for the Debtors to reorganize, *id.* ¶¶ 49-51.  The court found that the releases of the other parties, including the Legacy Forest directors and officers, were likewise "an integral and necessary part of the Plan[,] … represent a valid exercise of the Debtors' business judgment," and are "in the best interests of the estates."  *Id.* ¶ 52.

The bankruptcy court denied the Committee's oral motion to stay the effectiveness of the plan, concluding that the Committee had not satisfied "any of the four factors" for a stay pending appeal.  7/27 Hr'g Tr. [Dkt. 1369] at 79.  After expedited briefing and a hearing, this Court also declined to stay the plan.  *See* Mem. Op. & Order [Dkt. 29].  The Second Circuit likewise denied a stay request on August 10, 2016.  *See* 8/10 Motion Order [Dkt. 114].

On August 18, 2016, the bankruptcy court issued its 205-page Memorandum Decision expanding upon its confirmation order.  The court offered a lengthy summary of the testimony presented and declared that it was "persuaded that the Debtors' methodology for calculating the Adequate Protection Claims is well supported by applicable law and relevant facts."  Mem. Decision [Dkt. 1393], at 118.  By contrast, the Court found the Committee's contrary conclusions "inaccurate and/or unreliable, and in some instances, illogical."  *Id.* at 172.  The court found that the RBL Release was "an integral and important part of the success of the Debtors' reorganization," explaining that the RBL Released Parties agreed to negotiate with the Debtors only "[i]n exchange for the Settlement and inclusion of the Constructive Fraudulent Conveyance Claims, the Bad Acts Claims, and the Bucket II Claims in the RBL Release."  *Id.* at 166–67.  In the "absence of full releases …, the Debtors would not have obtained the significant debt and equity financing contemplated in connection with the Plan on the same terms or the significant concessions from the RBL Released Parties (*e.g.*, waiver of substantial deficiency claims)."  *Id.* at 167.  The court therefore approved both the releases and the settlement, noting that "the benefits of the Settlement strongly outweigh[ed] the likelihood of success and any rewards of litigation."  *Id.* at 192.  The court ruled that the plan satisfied every requirement for confirmation and stated: "It's not even close."  *See id.* at 2.

### B.       Substantial Consummation Of The Plan

The plan took effect on August 11, 2016.  A newly-formed Delaware holding company, led by a new Board of Directors (who, with the exception of the Chairman, replaced all of the former Directors), became the parent of SOGC ("Reorganized Sabine").  *See* Decl. of Michael Magilton ¶¶ 6, 12.  Reorganized Sabine dissolved two of the existing ten Debtors.  *Id.* ¶ 9.  More than $2.7 billion of debt was cancelled.  *Id.* ¶ 11.  Reorganized Sabine assumed certain of SOGC's contracts and obligations, including SOGC's obligation to defend and indemnify the RBL Lenders, the Second Lien Lenders, and the Legacy Forest officers and directors.  *See id.* ¶ 14.  Reorganized Sabine then began the process of distributing new common stock and warrants to SOGC's creditors.  *Id.* ¶ 8.  To date, Reorganized Sabine has distributed 93 percent of the stock; the remaining distribution is in process.  *Id.*

Reorganized Sabine also undertook a series of financial transactions necessary to exit bankruptcy.  To recapitalize the company, Reorganized Sabine entered into agreements for an Exit Revolver Credit Facility and a New Second Lien Credit Facility with the RBL Lenders.  *See id.* ¶ 13.  Because $100 million was deemed drawn under the Exit Revolver Credit Facility, Reorganized Sabine used its cash on hand immediately to repay those funds.  *See id.* ¶ 15.  SOGC's old RBL Facility, Second Lien Credit Facility, and senior notes were cancelled.  *Id.* ¶ 12.  The liens and mortgages on the old debt were terminated and released, and Reorganized Sabine granted new liens for the Exit Revolver Credit Facility and the New Second Lien Credit Facility.  *Id.* ¶ 13, 16.  Executory contracts and unexpired leases were assumed or rejected and payments to cure defaults under assumed contracts were made.  *Id.* ¶ 14.  Additionally, Reorganized Sabine's surety bond provider, Argonaut Insurance Company, issued a bond in favor of the Department of the Interior's Bureau of Ocean Energy Management in the amount of

5

$5.865 million, securing the decommissioning of certain oil and gas leases in the Gulf of Mexico. *See id.* ¶ 17.

This motion follows.

## ARGUMENT

This appeal must be dismissed because it is equitably moot.  The doctrine of equitable mootness allows a court to dismiss a bankruptcy appeal when a remedy cannot be granted "without unjustly upsetting a debtor's plan of reorganization."  *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 481 (2d Cir. 2012).  In bankruptcy, "the ability to achieve finality is essential to the fashioning of effective remedies."  *In re Chateaugay Corp.*, 988 F.2d 322, 325 (2d Cir. 1993) ("*Chateaugay I*").

No plan of reorganization could succeed if acts completed in accordance with an unstayed order of plan confirmation were routinely vulnerable to nullification.  *Id.* at 326; *see also In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) ("[A] plan of reorganization, once implemented, should be disturbed only for compelling reasons.").  The bankruptcy laws seek to provide debtors with a "fresh start," which would be thwarted if "businesses, investors, and the public" could not have confidence in "the finality of bankruptcy confirmation orders."  *In re U.S. Airways Grp., Inc.*, 369 F.3d 806, 810-11 (4th Cir. 2004).  "Every incremental risk of revision on appeal puts a cloud over the plan of reorganization, and derivatively over the assets of the reorganized firm."  *UNR*, 20 F.3d at 770.  The doctrine of equitable mootness thus restrains courts from "imperiling" this "fresh start."  *In re Chateaugay Corp.*, 10 F.3d 944, 953 (2d Cir. 1993) ("*Chateaugay II*").

"In this circuit, an appeal is *presumed* equitably moot where the debtor's plan of reorganization has been substantially consummated," and that presumption can be overcome only "if all five of the '*Chateaugay* factors' are met."  *In re Charter*, 691 F.3d at 482 (emphasis

added).   Specifically, the appellant must establish that (1) "'the court can still order some effective relief'" on its claims; (2) such relief "'will not affect the reemergence of the debtor as a revitalized corporate entity'"; (3) such relief will not "'unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court'"; (4) parties who would be adversely affected by the relief sought "'have notice of the appeal and an opportunity to participate in the proceedings'"; and (5) the appellant diligently pursued "'all available remedies to obtain a stay of execution of the objectionable order if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.'"   *Id.* (quoting *Chateaugay II*, 10 F.3d at 952–53).   Here, the presumption of equitable mootness has attached, and the Committee cannot overcome it.

## I.   The Plan Has Been Substantially Consummated.

There can be no doubt that Reorganized Sabine has substantially consummated the plan. *See* 11 U.S.C. § 1101(2) (defining "substantial consummation").   After the plan became effective, more than $2.7 billion of debt was cancelled.  Decl. of Michael Magilton ¶ 11.  A new holding company was created, and the old stock was cancelled.   *Id.* ¶ 6.  Nearly all of the distribution of cash, new debt, and new stock provided for in the plan has been accomplished. *See* 11 U.S.C. §§ 1101(2)(A), (C); *see also* Decl. of Michael Magilton ¶ 8.  Moreover, Reorganized Sabine obtained access to, and granted liens securing, new credit facilities that enabled it to emerge as a going concern.  *See id.* ¶¶ 13, 16.  Reorganized Sabine assumed and rejected contracts and made payments to cure any defaults under the assumed contracts.  *Id.* ¶ 14. The new Board of Directors has already met to chart the course of Reorganized Sabine.  *Id.* ¶ 13. Finally, Reorganized Sabine's surety bond provider issued a substantial bond in favor of the Bureau of Ocean Energy Management, as required to emerge from bankruptcy.  *Id.* ¶ 17.

The Second Circuit has held plans to have been substantially consummated under similar circumstances.  *See, e.g.*, *Charter*, 691 F.3d at 481, 484 n.3 (plan substantially consummated where the debtor had cancelled the equity issued by the prepetition debtor, issued shares in the reorganized debtor, converted notes issued by the prepetition debtor into new notes, and issued warrants); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 144 (2d Cir. 2005) (plan substantially consummated where "substantially all of the Reorganized Debtors' stock" had been issued, cash distributions had been made, consideration for that issuance had been received, and the Debtors had entered "into a host of contracts, leases, and other arrangements").  Consistent with the law in this Circuit, the plan itself specifies that "'[s]ubstantial [c]onsummation' …, as defined in 11 U.S.C. § 1101(2)," will have "occur[red] on the Effective Date."  Plan of Reorganization [Dkt. 1359-1], Art. IX, D.

## II.     The Committee Cannot Overcome The Presumption Of Equitable Mootness.

Nor can the Committee overcome the presumption of equitable mootness that arises from substantial consummation.  During the plan confirmation hearing, the Committee objected to the settlement that served as the plan's "centerpiece."  *See* Objections [Dkt. 1168] ¶¶ 7–10.  To the extent that this Court could now afford the Committee any relief, it would likely require significant revisions to the settlement embodied in the substantially-consummated plan.  But the settlement—including the settlement of any disputes over the secured lenders' adequate protection claims or the characterization of the adequate protection payments—was integral to the plan, and it would be profoundly inequitable to award such relief.

### A.     The Settlement Was Integral To The Plan.

At the confirmation hearing, the Committee objected to the settlement of the adequate protection claims held by the RBL Lenders and the Second Lien Lenders.  *See id.* ¶¶ 1, 7, 10, 37. The Committee contended that the Debtors had far overvalued those claims and undervalued

8

certain assets that were allegedly unencumbered, resulting in a settlement that was neither within the range of reasonableness nor fair and equitable.  *See id.*  The Committee objected to the amount of value that the Legacy Forest unsecured creditors were scheduled to receive under the plan and to the releases of claims against the RBL Lenders and the RBL Agent.  *See id.* ¶ 71.

As the Committee concedes, the settlement is the "centerpiece" of the plan.  Objections [Dkt. 1168] ¶ 10.  The RBL Lenders "waive[d] any right to a recovery or distribution of New Common Stock and Warrants in the Second Lien Equity Pool and the Unsecured Equity Pool on account of its RBL Secured Claims and its First Lien Adequate Protection Claim … in exchange for the releases provided" in the plan.  Plan of Reorganization [Dkt. 1359-1], Art. VIII.  Those releases included "all Claims and Causes of Action (other than the Settled Claims) made, or which could have been made, on behalf of the Debtors or the Non-Debtor Subsidiaries, including the constructive fraudulent conveyances, … breaches of fiduciary duty, … and other claims for reallocation of value made during the *STN* trial."  Plan of Reorganization [Dkt. 1359-1], Art. I, Part A, ¶ 131; *see also id.* Art. VIII.

The settlement was necessary to "provid[e] unsecured creditors with a recovery of *any* value."  Mem. Decision [Dkt. 1393], at 178.  Because of the diminution in value of the secured lenders' collateral during bankruptcy, "the RBL Lenders' Adequate Protection Claim would [have] 'swamp[ed]' the Debtors' unencumbered assets," making any recovery for the unsecured creditors unrealistic.  *Id.* at 21, 144, 176.  The RBL Lenders were willing to settle their claims, accept equity instead of cash for those claims, cede common equity and warrants in the Reorganized Debtors to the Second Lien Lenders and unsecured creditors, and provide exit financing only *in exchange* for the debtor and third-party releases.  *See id.* at 72.  Without those releases, "the Debtors would not have obtained the significant debt and equity financing

9

contemplated in connection with the Plan on the same terms or the significant concessions from the RBL Released parties (*e.g.*, waiver of substantial deficiency claims)." *Id.* at 167. The releases were thus "a portion of a deal that is inextricably intertwined with the Settlement" and "integral, important, and necessary to the success of the Plan." *Id.*

Moreover, the bankruptcy court found "compelling evidence of the Settlement's significant future benefits to the Debtors' estates and their creditors." *Id.* at 184. The settlement "provide[d] a recovery to the Debtors' current creditors in real time—a recovery that would otherwise be subject to the delay, risk, and uncertainty of litigation and likely would be wholly nonexistent but for the Settlement." *Id.* at 185. To the Debtors, it provided the opportunity "to emerge from chapter 11 and move their business forward without the distractions inherent in the chapter 11 process and the exorbitant costs it entails." *Id.* at 184. Indeed, a key component of the economic bargain at the heart of the plan is the promise that Reorganized Sabine, its new board, and its management team will be able to "return to focusing their time on operations and new strategic opportunities rather than on litigation and its accompanying distractions," especially legacy litigation involving claims repeatedly found not colorable. *Id.* at 185.

For these reasons, among others, the bankruptcy court found that the settlement was "an integral element of the transactions incorporated into the Plan" and "important to [the plan's] overall objectives." Confirmation Order [Dkt. 1359] ¶ 59. In short, the settlement was the heart of the plan, "confer[red] material benefits on … the Debtors, the Estates, and their creditors," and allowed the Debtors to emerge from bankruptcy. *Id.*

The non-severability clauses in both the plan and confirmation order underscore the point. Each document provided that "[t]he compromises, settlements and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan." Plan

10

of Reorganization [Dkt. 1359-1], Art. VIII; Confirmation Order [Dkt. 1359] ¶ 58.  Each also declared "each term and provision of the Plan … nonseverable and mutually dependent."  Plan of Reorganization [Dkt. 1359-1], Art. XII; Confirmation Order [Dkt. 1359] ¶¶ 58, 141.

      **B.**     **Unraveling The Settlement Would Be Inequitable.**

Precisely because the settlement and releases were integral to the plan, attempting to unravel them now "would amount to imposing a different plan of reorganization on the parties." *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1049 (7th Cir. 1993).  This point was made repeatedly during the stay proceedings, where the Committee asserted that its interests could be protected on appeal by a stay of the releases and withholding of 74 percent of the common stock of the Reorganized Debtors from the RBL Lenders.  7/27 Hr'g Tr. [Dkt. 1369], at 41.  The bankruptcy court noted that the Committee's proposed stay would constitute "a stay of the issuance of the plan consideration" and would be "a complete showstopper."  *Id.* at 42, 46.  The district court agreed, noting that the proposed stay would amount to "a significant modification of the Plan and would have the effect of unraveling the entire Plan."  Mem. Op. & Order [Dkt. 47] at 8.

Moreover, it is simply infeasible to provide relief to the Committee now.  The claims have been released, the prepetition debt has been cancelled and replaced with new debt, and 93 percent of the common stock has already been distributed.  Any attempt to sever those releases or alter that distribution while leaving the rest of the substantially consummated plan intact would "ignore the tradeoff that allowed the parties to settle in the first instance."  *In re Delta Air Lines, Inc.*, 374 B.R. 516, 523–25 (S.D.N.Y. 2007); *see also Mac Panel Co. v. Virginia Panel Co.*, 283 F.3d 622, 626 (4th Cir. 2002) (dismissing appeal as equitably moot and refusing to subject third-party non-debtor to lawsuit it paid to avoid).  For that very reason, the Second Circuit has commented that it would not take such action without affording the parties the opportunity to reconsider the overall bargain.  *See Charter*, 691 F.3d at 486; *Metromedia*, 416

11

F.3d at 145; *see also In re Crystal Oil*, 854 F.2d 79, 81 (5th Cir. 1999) (declining to strike a provision without "giving [the affected party] a chance to reevaluate the concessions it made to get" that provision); *In re U.S. Brass Corp.*, 169 F.3d 957, 962 (5th Cir. 1999) (same).

But, now that the plan has been substantially consummated, such a do-over would be impossible: it would "create an unmanageable, uncontrollable situation for the Bankruptcy Court" that would require "unravel[ing] intricate transactions." *Chateaugay II*, 10 F.3d at 953 (internal quotation omitted). Since exiting bankruptcy, a new Board of Directors has taken over Reorganized Sabine, and the former Board has resigned. Decl. of Michael Magilton ¶ 12. Reorganized Sabine has extinguished all previously issued shares of common stock and distributed 93 percent of its new common stock to its new equity interest holders. *See id.* ¶ 8. It has entered into an Exit Revolver Credit Facility, made a $100 million cash payment on the funds deemed drawn, and entered into a new $150 million Second Lien Credit Facility. *See id.* ¶¶ 13, 15. It granted new liens securing each of these obligations, and SOGC's former RBL Loan and Second Lien Loan, and their associated liens, were cancelled. *Id.* ¶ 16. Revoking any of the plan releases or clawing back any of the equity distributions would fundamentally alter the settlement and the plan, and would require unwinding all of these complex transactions. There is simply no feasible and fair way, at this late date, to do so. *See Metromedia*, 416 F.3d at 145 ("[W]e cannot predict what will happen if this settlement is in any part altered.").

The Second Circuit has held in similar circumstances that creditors could not establish the second or third *Chateaugay* factors. *See Charter*, 691 F.3d at 485. The appellants in *Charter*, for example, asserted that a court could redress alleged errors in a settlement and releases in a confirmed plan by ordering "a prospective monetary award" and severing certain third-party releases in a debtor's plan while leaving the rest of the plan intact. *Id.* at 483-85. The

12

Second Circuit disagreed, recognizing that "heavy transactional costs" would be associated with any prospective monetary award and that "striking the releases[] would be no ministerial task." *Id.* The releases were "a critical piece" of "an intense multi-party negotiation" that some of the parties might not be willing to give up without "reneging on at least part of the benefits [they] bestowed" in exchange. *Id.* at 486. Because the creditors had "failed to establish that the relief they request[ed] would not affect [the debtor's] emergence as a revitalized entity and would not require unraveling complex transactions undertaken after the Plan was consummated," the court dismissed the appeal as equitably moot. *Id.* at 485-86, 488.

The Second Circuit reached the same conclusion in *Metromedia*, a case also involving a challenge to third-party releases in a plan of reorganization. *See* 416 F.3d at 141-42. Although the court concluded that the third-party releases at issue there were improper, it left the confirmation order intact. *See id.* at 145. The court emphasized the inequity of simply severing the third-party releases: "If appellants' claims are substantial (as they urge), it is as likely as not that the bargain struck by the debtor and the released parties might have been different without the releases." *Id.* at 145. Because it would have been impossible to allow the released parties to renegotiate the releases without jeopardizing the entire plan, the appeal was equitably moot.

This Court should reach the same conclusion here. The Committee is not seeking "some fractional recovery in the form of monetary damages" that could be awarded "without disturbing the Plan or affecting reorganized [SOGC's] fresh start." *Ahuja v. Lightsquared Inc.*, 644 F. App'x 24, 28 (2d Cir. Mar. 22, 2016). Instead, it has repeatedly demanded that the settlement—and particularly its equity distribution and releases—be rejected. *See* Objections [Dkt. 1168] ¶¶ 34, 39, 71. But that relief would threaten the entire plan, jeopardize the Debtors' emergence as revitalized corporate entities, and "knock the props out from under the authorization for every

13

transaction that has taken place" since the plan became effective.  *See Chateaugay II*, 10 F.3d at 952-53 (internal quotation omitted).

The appeal is thus equitably moot.

## CONCLUSION

For the foregoing reasons, the undersigned parties respectfully request that the Court dismiss the Committee's appeal as equitably moot.

Dated:   September 9, 2016

/s/ Gabor Balassa

James H.M. Sprayregen, P.C.
Paul M. Basta, P.C.
Jonathan S. Henes, P.C.
Christopher Marcus, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL
LLP
601 Lexington Avenue
New York, NY   10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
james.sprayregen@kirkland.com
paul.basta@kirkland.com
jonathan.henes@kirkland.com
christopher.marcus@kirkland.com

Gabor Balassa, P.C. (admitted *pro hac vice*)
Ryan Blaine Bennett (*pro hac vice* forthcoming)
A. Katrine (Katie) Jakola (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL
LLP
300 North LaSalle Street
Chicago, IL   60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
gabor.balassa@kirkland.com
ryan.bennett@kirkland.com
katie.jakola@kirkland.com

Christopher Landau, P.C.
Jennifer M. Bandy
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC   20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
clandau@kirkland.com
jennifer.bandy@kirkland.com

*Counsel for Reorganized Debtors-Appellees*

/s/ *Margot B. Schonholtz*
Margot B. Schonholtz, Esq.
LINKLATERS LLP
1345 Avenue of the Americas
New York, NY   10105
Telephone: (212) 903-9043
Facsimile: (212) 903-9100
margot.schonholtz@linklaters.com

/s/ *Joseph J. Frank*
Joseph J. Frank, Esq.
Fredric Sosnick, Esq.
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
joseph.frank@shearman.com
fsosnick@shearman.com

*Counsel for Appellee Wells Fargo Bank, N.A.,
as First Lien Agent*

*Counsel for Barclays Bank PLC and Barclays
Capital Inc.*

/s/ *Moses Silverman*
Alan William Kornberg, Esq.
Moses Silverman, Esq.
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY   10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
akornberg@paulweiss.com
msilverman@paulweiss.com

*Counsel for Appellee Wilmington Trust, N.A.*

/s/ *Daniel A. Fliman*
Kenneth R. David, Esq.
Daniel A. Fliman, Esq.
KASOWITZ, BENSON, TORRES
   & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800
kdavid@kasowitz.com
dfliman@kasowitz.com

*Counsel for Appellees Richard J. Carty, Loren Carroll, Dod Fraser, James Lee, James Lightner, Patrick R. McDonald, Raymond Wilcox and Victor Wind*

/s/ *Steven J. Reisman*
Steven J. Reisman, Esq.
Theresa A. Foudy, Esq.
Kevin Arthur Meehan, Esq.
CURTIS, MALLET-PREVOST,
   COLT & MOSLE LLP
101 Park Avenue
New York, NY   10178
Telephone: (212) 696-8000
Facsimile: (212) 697-1559
sreisman@curtis.com
tfoudy@curtis.com
kmeehan@curtis.com

*Counsel for Appellees John Yearwood, David Sambrooks, and Duane Radtke*