USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2-3-17

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
IN RE SABINE OIL & GAS CORP.,      :
et al.,                            :
                                   :
              Reorganized Debtors. :    16 Civ. 6054 (LAP)
                                   :
OFFICIAL COMMITTEE OF UNSECURED    :
CREDITORS, et al.,                 :
                                   :
                      Appellants,  :    Memorandum Opinion
                                   :         and Order
     -against-                     :
                                   :
SABINE OIL & GAS CORP., et al.     :
                                   :
                      Appellees.   :
                                   :
-----------------------------------x
```

LORETTA A. PRESKA, United States District Judge:

Pursuant to 28 U.S.C. § 158(a) and Federal Rule of Bankruptcy Procedure 8003(a), the Official Committee of Unsecured Creditors (the "Official Committee"), the Bank of New York Melon Trust Company as the Trustee under the 2017 Notes Indenture ("BONY"), the Wilmington Savings Fund Society, FSB, as Indenture Trustee for the Forest Oil 7.25% Unsecured Notes due 2019, and Delaware Trust Company as the Indenture Trustees for the Forest Oil 7% Unsecured Notes due 2020, collectively referred to as the Appellants, have appealed the Bankruptcy Court's Confirmation Order of the Plan of Reorganization (the "Confirmation Order") for the Debtors, Sabine Oil & Gas Corporation and its related entities ("SOGC" or the "Debtors").

1

SOGC, as the reorganized debtors-appellees, has moved to dismiss this appeal. (Mot. Dismiss, Sept. 9, 2016, ECF No. 42). Appellants have submitted a memorandum of law in opposition to the motion to dismiss, (Opp., Nov. 3, 2016, ECF No. 62), and SOGC has replied in turn. (Reply, Nov. 14, 2016, ECF No. 63). Because the plan of reorganization has been substantially consummated and unraveling the settlement would both frustrate Debtor's emergence from bankruptcy and require unwinding complex transactions in an infeasible manner, the Court finds that the appeal of the Confirmation Order is equitably moot. Accordingly, the motion to dismiss is granted.

## I. Background

SOGC is engaged in the acquisition, production, exploration, and development of onshore oil and natural gas properties in the United States. (Mot. Dismiss at 1). In December 2014, Sabine Oil & Gas, LLC ("Legacy Sabine") merged with Forest Oil Corporation ("Legacy Forest") to create SOGC. (Id.). A sharp slump in energy prices led SOGC to file for Chapter 11 bankruptcy in July 2015 and SOGC's Board to establish an Independent Committee to investigate potential claims arising from the merger of Legacy Sabine and Legacy Forest. (Id.).

On June 13, 2016, the Bankruptcy Court (Chapman, J.) began a 14-day confirmation hearing on the Debtors' Second Amended Chapter 11 Joint Plan of Reorganization. (Mot. Dismiss at 2).

2

On July 27, 2016, the Bankruptcy Court confirmed the plan in its Confirmation Order. (Id.). After extensive negotiations between the Debtors, the First Lien Lenders that had provided the Debtors with reserve-based loans ("RBL Lenders"), and certain Second Lien Lenders, the parties reached a settlement whose terms include: the RBL Lenders (1) settled their adequate protection claims, (2) settled certain lien-related disputes, (3) accepted equity in satisfaction of their adequate protection and secured claims totaling over $1 billion, (4) waived their unsecured deficiency claims, (5) provided commitments of up to $200 million in exit financing, (6) ceded over $70 million in stock and warrants to the Second Lien Lenders, and (7) ceded more than $28 million in stock and warrants to unsecured and undersecured creditors. (Id. at 2-3). In return, the Confirmation Order released RBL Lenders from estate claims and certain third-party claims against the RBL Lenders and the Legacy Forest officers and directors from the estate claims. (Id. at 3).

The Bankruptcy Court rejected the Official Committee's objections to the settlement and releases in the Plan, finding that they were "integral and necessary part of the Plan and represent a valid exercise of the Debtors' business judgment" and that they are "in the best interests of the estates." (Confirmation Order ¶ 52, July 27, 2016, ECF No. 6 Ex. A

3

(Florence Aff.)).  During the hearing, evidence was presented that there had been an extensive investigation into the constructive fraudulent conveyance claims and that the releases in favor of the RBLs and the Forest Directors were based on a determination that the claims were not colorable or were not in the best interest of the estate to pursue.  (Tr. Hearing 46-47, June 22, 2016, ECF No. 18 Ex. D (Balassa Aff.)).  The releases were an essential part of the package with the RBL Lenders.  (Id. at 48, 149 (June 23, 2016), 248 (June 13, 2016)).

The Bankruptcy Court expanded on its Confirmation Order in a 205-page Memorandum Decision, explaining that the RBL releases were "an integral and important part of the success of the Debtors' reorganization" and that the RBL Lenders agreed to negotiate with the Debtors only "[i]n exchange for the Settlement and inclusion of the Constructive Fraudulent Conveyance Claims, the Bad Act Claims, and the Bucket II Claims in the RBL Release."  (Mem. Decision 166-67, Aug. 18, 2016, ECF No. 6 Ex. B (Florence Aff.)).  The Bankruptcy Court concluded that "[t]he settlement . . . is fair, reasonable, and well above the lowest point in the range of reasonableness and the plan otherwise satisfies each and every requirement for confirmation. It's not even close."  (Id. at 2).

4

## II. Procedural History

On July 27, 2016, the Official Committee made an oral motion for a stay of the Confirmation Order pending the appeal of that order. (Tr. Hearing 79 (July 27, 2016)). This Court also declined to stay the plan, (see Mem. Op. and Order, Aug. 5, 2016, ECF No. 29), as did the Court of Appeals on August 10, 2016. (See Mot. Dismiss at 4).

In addition, on March 31, 2016, the Bankruptcy Court denied the Official Committee and other unsecured lenders (the "STN appellants") standing to pursue claims on behalf of the estate. The Official Committee sought standing to bring claims against the RBLs, the Second Lien Lenders, and several directors and officers of the pre-combination entities, Forest and Sabine, First Reserve Fund, and members of the current Board of Directors of SOGC. See generally In re Sabine Oil & Gas Corp., 547 B.R. 503 (Bankr. S.D.N.Y. 2016), aff'd, No. 16-cv-2561 (JGK), 2016 WL 3554995 (S.D.N.Y. June 24, 2016). On April 5, 2016, the STN appellants moved for a stay pending appeal of the STN Order. On April 21, 2016, the Bankruptcy Court denied the stay. In re Sabine Oil & Gas Corp., 548 B.R. 674, 678 (Bankr. S.D.N.Y. 2016).

On June 24, 2016, this Court affirmed the Bankruptcy Court's STN decision, concluding that the STN appellants failed to plead colorable claims for constructive fraudulent conveyance

against the RBLs and Second Lien Lenders, did not plead plausible claims against the Forest and Sabine directors and officers, and failed to show that bringing a narrow set of claims against the Second Lien Lenders was in the best interest of the estate. In re Sabine Oil & Gas Corp., 2016 WL 3554995, at *8-*11. The STN appellants did not seek a stay of this Court's STN decision nor did they appeal the denial by the Bankruptcy Court of their motion for a stay of the STN Order.

The STN appellants appealed the STN decision to the Court of Appeals. See In re Sabine Oil & Gas Corp., 16-2187 (2d Cir. June 27, 2016). The STN appellants moved to expedite the appeal. In a one-judge motion issued by Judge Livingston on July 15, 2016, the motion to expedite was denied. Id. Appellees subsequently moved to dismiss the STN appeal as constitutionally moot, which the Court of Appeals granted on November 22, 2016. See In re Sabine Oil & Gas Corp., 16-2187 (2d Cir. Nov. 22, 2016).

The Court now turns to the Debtors' motion to dismiss the appeal of the Bankruptcy Court's Confirmation Order on the grounds of equitable mootness.

### III. Discussion

#### a. Standard of Review

This Court has jurisdiction to hear appeals from decisions of a bankruptcy court pursuant to 28 U.S.C. § 158(a), which

6

provides in relevant part that "[t]he district courts of the United States shall have jurisdiction to hear appeals ... from final judgments, orders, and decrees; ... [and,] with leave of court, from other interlocutory orders and decrees ... of bankruptcy judges." 28 U.S.C. § 158(a). A district court reviews a bankruptcy court's findings of fact for clear error and its conclusions of law de novo. Overbaugh v. Household Bank, N.A. (In re Overbaugh), 559 F.3d 125, 129 (2d Cir.2009); see Fed. R. Bankr. P. 8013 (a district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree," and "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous").

### b. Substantial Consummation

Section 1101(2) of the Bankruptcy Code defines "substantial consummation" of a plan of reorganization as follows: "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan."

7

SOGC's plan of reorganization took effect on August 11, 2016.  (Mot. Dismiss 5).  As of September 2016, the following actions, among others, were carried out pursuant to the plan:

- SOGC's common stock was cancelled, and SOGC merged with and into a newly-formed, wholly-owned subsidiary of Sabine Holdings.  (Decl. of Michael Magilton ¶¶ 6, 12, Sept. 9, 2016, ECF No. 44).

- Reorganized Sabine dissolved two out of ten existing Debtors.  (Id. ¶ 9).

- More than $2.7 billion of debt held by SOGC was cancelled.  (Id. ¶ 11).

- Reorganized Sabine assumed some of SOGC's contracts and obligations, including SOGC's obligation to defend and indemnify the Legacy Forest officers and directors, and certain of SOGC's executory contracts and unexpired leases.  Reorganized Sabine made payments to cure defaults under those assumed contracts and leases.  (Id. ¶ 14).

- SOGC distributed 93% of its common stock to the holders of the Debtors' first-lien secured claims.  The remaining 7% was in the process of being distributed to holders of the Debtors' second-lien claims and to certain unsecured claimants as of September 2016.  (Id. ¶ 8).

8

- SOGC's board of directors resigned; boards of directors for Reorganized SOGC and Sabine Holdings were appointed. SOGC's old RBL facility, Second Lien Credit Facility, and senior notes were cancelled. (Id. ¶ 12).
- The new Sabine Holdings board entered into agreements establishing a new reserve-based first-lien facility with commitments for up to $200 million and an initial borrowing base of $150 million (the "Exit Revolver Credit Facility"), as well a second-lien credit facility of $150 million. Reorganized Sabine granted replacement liens securing its obligations under the Exit Revolver Credit Facility and second-lien credit facility. (Id. ¶¶ 13, 16).
- Reorganized SOGC used its cash on hand immediately to repay $100 million of the Exit Revolver Credit Facility that was deemed drawn. (Id. ¶ 15).

Appellants respond by arguing that "the plan has not been consummated in a meaningful manner" and that the actions taken pursuant to the reorganization plan represent a mere "mirage of paper transactions." (Opp. at 12). Considering the wide-ranging equity and cash distributions outlined above, Appellants' argument lacks credibility. Contracts, obligations, and leases have been transferred to the Reorganized Sabine; management has been transferred to the new boards of directors of Reorganized SOGC and Sabine Holdings; 93% of SOGC's common

9

stock has been distributed, with the remaining 7% in the process of being transferred as of September 2016; billions of dollars in debt have been cancelled, and hundreds of millions of dollars in new credit facilities have been established.  Under these circumstances, the Court has no difficulty concluding that Appellees have satisfied the requirements of Section 1101(2) of the Bankruptcy Code.  See In re Metromedia Fiber Network, Inc., 416 F.3d 144 (2d Cir. 2005)(reorganization plan substantially consummated where reorganized debtors' stock had been issued, cash distributions made and consideration thereof received, and the debtors had entered "into a host of contracts, leases, and other arrangements").  Accordingly, the Court finds that the reorganization plan has been substantially consummated.

### c. Equitable Mootness

The Court of Appeals has instructed that "an appeal is presumed equitably moot where the debtor's plan of reorganization has been substantially consummated." In re Charter Commc'ns, Inc., 691 F.3d 476, 482 (2d Cir. 20120).  As explained above, the presumption of equitable mootness has attached because the plan of reorganization has been substantially consummated.  The presumption of equitable mootness can be overcome only if all five of the "Chateaugay factors" are met: (1) "the court can still order some effective relief"; (2) "such relief will not affect the re-emergence of

10

the debtor as a revitalized corporate entity"; (3) "such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court"; (4) "the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings"; and (5) "the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from." Id. (quoting In re Chateaugay Corp., 10 F.3d 944, 952-53 (2d Cir. 1993)). The Court must conduct an "analytical inquiry into the likely effects of the relief an appellant seeks and must be based on facts. Only if all five Chateaugay factors are met, and if the appellant prevails on the merits of its legal claims, will relief be granted." Id.

Appellants argue as a threshold matter that it is the practice in this Circuit to consider equitable mootness only after full briefing on the merits. (Opp. at 8 (citing Ad Hoc Adelphia Trade Claims Comm. V. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 222 F. App'z 7 (2d Cir. 2006))). While the Court notes that it "is not inhibited from considering the merits before considering equitable mootness," the Court

11

does not find that it is required to do so. Metromedia, 416 F.3d at 144. Indeed, courts in this circuit regularly dismiss bankruptcy appeals as equitably moot without considering their merits. See, e.g., In re MF Global Holdings Ltd., No. 13 Civ. 3532, 2014 WL 231130, at *1 (S.D.N.Y. Jan. 22, 2014)("[B]efore reaching the merits of Appellants' appeal, the Court must determine whether the appeal is equitably moot."); In re Great Atlantic & Pacific Tea Co., No. 12 Civ. 2809, 2013 WL 1310330 (S.D.N.Y. Mar. 31, 2013); In re Calpine Corp., 390 B.R. 508, n.9 (S.D.N.Y. 2008). Accordingly, the Court finds that it need not require full briefing on the merits before considering Appellees' equitable mootness argument.

Appellants further argue that the Bankruptcy Court did not have jurisdiction to release claims in the Confirmation Order while the STN Order was on appeal; as relief, they seek to have the releases vacated. (Opp. at 2, 10-11). As an initial matter, the Court notes that Appellants have made this argument repeatedly—and unsuccessfully—before this Court and the Court of Appeals. In any event, the Appellants' contention that the Court must resolve the issue of the Bankruptcy Court's jurisdiction before considering equitable mootness is baseless. By turning first to equitable mootness, the Court is not resolving this appeal on the merits. The Supreme Court has recognized that federal courts may "choose among threshold

12

grounds for denying audience to a case on the merits." Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 585 (1999). Indeed, "there is no mandatory sequencing of nonmerits issues." Sinochem Int'l Co. v. Malaysian Int'l Shipping Corp., 549 U.S. 422, 423 (2007). Accordingly, the Court will proceed directly to a consideration of equitable mootness without first addressing Appellants' arguments regarding the Bankruptcy Court's jurisdiction.

Appellants seek relief from the Confirmation Order on several grounds. First, Appellants argue that the Bankruptcy Court released those claims—including claims against the new RBLs, the Legacy Sabine lenders, and former Forest directors and officers—"for no consideration at all" and that the releases should therefore be invalidated. (Opp. at 2, 16-18). Second, Appellants seek to challenge the valuation of the RBL Lenders' adequate protection claim and the Bucket II claims; as relief, they seek to vacate that settlement "by reallocating a portion of the equity the secured lenders received to unsecured creditors, or through the issuance of additional shares or debt to unsecured creditors," to the tune of "hundreds of millions of dollars." (Id. at 2, 19).

Appellants therefore seek to vacate the RBL releases, which the Bankruptcy Court found was an "absolute condition of the Settlement," as well as the "two most significant aspects of the

13

Settlement: the estimated amount of the Adequate Protection Claims and the estimated recoveries potentially available to unsecured creditors if the Bucket II claims were litigated." (Mem. Decision at 15, 72). It is beyond cavil that granting such relief would alter the bargain that allowed SOGC to emerge from bankruptcy. After "very, very challenging" discussions, the RBL Lenders were willing to settle their claims, accept equity in exchange for cash, cede common equity and warrants to the Second Lien Lenders and unsecured creditors, and provide exit financing only on the "absolute condition" of the Debtor and third-party releases. (See id. at 72). Appellants' arguments "overlook[] the fact that any changes to the Plan could not be made in isolation" and that granting the requested relief would "require an entirely new reorganization plan." Freeman v. Journal Register Co., 452 B.R. 367, 374 (S.D.N.Y. 2010).

It is likewise the case that vacating the releases of the Forest directors and other lenders would fundamentally reshape the reorganization plan. Negotiations between the various parties were, as the Bankruptcy Court noted, "difficult and contentious" and involved "extensive arm's-length negotiations and numerous mediation sessions." (Mem. Decision at 197). Further, the secured lenders were likely entitled to the entire value of the estate, (see id. at 77), and the lenders agreed to

14

compromise those claims only in exchange for all the releases in the plan of reorganization. (See id. at 190-91). Since the releases were an "integral component" of the plan, vacating them would significantly alter the financial bargain struck by the lenders in relinquishing their claims in return for equity ownership in Reorganized SOGC. (see id. at 190-91). The importance of the settlement to the overall reorganization plan is also underscored by the inclusion of non-severability clauses in both the plan and Confirmation Order, which state that "[t]he compromises, settlements and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan." (Confirmation Order ¶ 58). However, the Court notes that there is substantial evidence in the record independent of the non-severability clauses demonstrating that the settlement was integral to the plan of reorganization. See Charter, 691 F.3d at 485 ("While a nonseverability clause may be one indication that a particular term was important to the bargaining parties, a district court cannot rely on such a clause to the exclusion of other evidence" to support a finding of equitable mootness).

The Court of Appeals has instructed that where "it is as likely as not that the bargain struck by the debtor and the released parties might have been different without the releases," it is inappropriate to grant relief "without vacatur

and remand for further findings and proceedings." Metromedia, 416 F.3d at 145. The Bankruptcy Court made clear that the reorganization plan would have been untenable without the settlement and releases, without which "the most likely alternative for the Debtors would have been a liquidation." (Mem. Decision at 167). In granting Appellants' requested relief, therefore, the Court would have little choice but to remand the entirety of the reorganization plan for further negotiations. But to do so would necessarily threaten "the re-emergence of the debtor as a revitalized corporate entity" since liquidation of SOGC is the most likely alternative. See Chateaugay, 10 F.3d at 953. Accordingly, Appellants have failed to satisfy Chateaugay factor two.

Furthermore, such relief would entail reinstating more than $2.7 billion in debt, cancelling $350 million in new debt, reinstating SOGC's newly-issued stock and equity warrants, more than 93% of which has already been distributed, and threatening numerous transactions with federal and state governments, such as the filing of Reorganized SOGC's certificate of incorporation and bylaws, the suspension of SOGC SEC reporting obligations, the dissolution of two of the debtors, and the issuance of a $5.865 million bond in favor of the Department of the Interior's Bureau of Ocean Energy Management. (Decl. of Michael Magilton ¶¶ 7, 8, 9, 10, 11, 13, 17). Considering the complexity and

size of the transactions at issue, the Court has no difficulty concluding that granting Appellants' request relief would "unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court." Chateaugay, 10 F.3d at 953. The Court therefore concludes that it is infeasible to provide the relief that the Official Committee seeks in this appeal. Accordingly, Appellants have failed to meet Chateaugay factor three as well.

Finally, and contrary to Appellants' statements otherwise, (Opp. at 14-15), Appellants did not seek "all available remedies to obtain a stay of execution of the objectionable order if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from." Chateaugay, 10 F.3d at 953. The Court takes note that Appellants did diligently pursue stays as they appealed the Bankruptcy Court's Confirmation Order. However, the Official Committee did not seek a stay of this Court's STN decision, nor did they appeal the denial by the Bankruptcy Court of their motion for a stay of the STN Order. For this reason, it is simply not the case that Appellants sought a stay "at every possible opportunity." (Opp. at 14). The failure to do so allowed the reorganization plan to be substantially consummated in August 2016, which "create[d] a

17

situation rendering it inequitable to reverse" the Confirmation Order. As a result, Appellants have also failed to satisfy Chateaugay factor five.

In Charter, the Court of Appeals dismissed a bankruptcy appeal on equitable mootness grounds under a similar set of circumstances. 691 F.3d at 483-85. The appellants sought to correct alleged errors in a settlement plan by ordering a money award and severing third-party releases. Id. The Court of Appeals noted that such relief would impose "heavy transactional costs" and that "striking the releases[] would be no ministerial task." Id. at 485. Indeed, the releases were "a critical piece" of "an intense multi-party negotiation," which could not be stricken from the settlement without some of the parties "reneging on at least part of the benefits" bestowed. Id. at 486. The Court of Appeals dismissed the appeal as equitably moot because the appellants "failed to establish that the relief they request[ed] would not affect [debtor]'s emergence as a revitalized entity and would not require unraveling complex transactions undertaken after the Plan was consummated (factors 2 and 3)." Id. at 485.

Similarly, the Official Committee is seeking relief that would vacate the releases and settlement that form the very heart of the reorganization plan. But granting such relief would threaten the entire plan by both frustrating the emergence

of the Debtors from bankruptcy and unravelling complex transactions that would create an unmanageable situation for the Bankruptcy Court.  See Chateaugay, 10 F.3d at 952-53.  Further, Appellants' failure to seek a stay of the STN decisions, which allowed the plan to be substantially consummated in August 2016, has thereby "render[ed] relief inequitable."  Metromedia, 416 F.3d at 144; see also TWA, Inc. v. Texaco, Inc. (In re Texaco Inc.), 92 B.R. 38, 46 (S.D.N.Y. 1988)("[T]here fairly exists a strong presumption that appellants' challenges have been rendered moot due to their inability or unwillingness to seek a stay." (quotation omitted)).

Accordingly, this appeal is equitably moot.

### IV. Conclusion

The motion to dismiss, (ECF No. 42), is granted.

SO ORDERED.

Dated:   New York, New York
         February 3, 2017

*Loretta A. Preska*

LORETTA A. PRESKA
United States District Judge